FILED

2011 Jan-26  PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN ALEXANDER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-09-S-1396-NW |
| | ) | |
| CITY OF MUSCLE SHOALS, | ) | |
| ALABAMA; ROBERT EVANS; | ) | |
| EDDIE LANG; TOMMY | ) | |
| SKIPWORTH; CHARLES | ) | |
| SOCKWELL; CHRIS BROWN; | ) | |
| ASHLEY JONES; JONATHON | ) | |
| TERRY; JOE PAMPINTO; NEAL | ) | |
| WILLIS; JERRY "KNIGHT" | ) | |
| HOLLAND; and ALLEN NOLES, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Stephen Alexander, filed this action against the City of Muscle Shoals, Alabama (the "City"), and more than a dozen of its officials, pursuant to 42 U.S.C. § 1983, asserting that his constitutional rights were violated during his nine-day incarceration in the City's municipal jail.[1]  Specifically, plaintiff alleged that one group of defendants — the City; Muscle Shoals Police Chief Robert Evans; Police Officers Eddie Lang, Tommy Skipworth, Jonathon Terry; and Jailers Chris Sockwell,

---

[1] Doc. no. 1 *passim*.

Chris Brown, and Ashley Jones — were deliberately indifferent to his serious medical needs and his health and safety in violation of his rights as a pretrial detainee under the Due Process Clause of the Fourteen Amendment.[2]  Further, plaintiff alleged that another set of defendants — the City; the City's Mayor, David H. Bradford;[3] and City Councilmembers Joe Pampinto, Neal Willis, Jerry "Knight" Grissom, James "Jim" Holland, and Allen Noles — violated his Fourteenth Amendment rights by failing to afford him a prompt appearance before a judicial officer after he was detained.[4]  In addition, plaintiff alleged state law claims against each of the individual officers and the jailers, contending that they negligently, carelessly, and/or wantonly caused him injury.

This action is presently before the court on four motions:  (1) a motion for summary judgment filed by all defendants as to all claims that plaintiff asserts;[5] (2)

---

[2] Doc. no. 1, ¶¶ 51-54.

[3] There is some confusion about Mayor Bradford's status in this case.  This confusion will be addressed more fully below, but for present purposes it is only important to note that plaintiff alleged that the mayor was liable for denial of his right to an initial appearance in Count III of the initial complaint.  Doc. no. 1, ¶ 55.

[4] *Id.* ¶¶ 55-56.

[5] Doc. no. 49 (Defendants' Motion for Summary Judgment). *Nota bene:* defendants' brief in support of their motion for summary judgment is attached as the first attachment to their motion for summary judgment.  However, the denomination of exhibits within defendants' evidentiary submission, filed under the same docket number, begins with the number "1," even though the court's Case Management/Electronic Case File system has denominated the brief as the first exhibit.  Henceforth, to avoid confusion, the court will refer to the exhibits defendants have submitted in support of their motion by the exhibit numbers that defendants assigned to them and will refer to defendants' brief as "Defendants' Brief in Support of their Motion for Summary Judgment."

a motion filed by plaintiff to strike the affidavit of defendants' "police/jail practices expert," Leonard H. Sims;[6] (3) plaintiff's motion for leave to file an amended complaint;[7] and (4) defendants' motion to strike portions of the brief that plaintiff filed in opposition to their motion for summary judgment.[8]  Upon consideration and in light of the parties' briefs and evidentiary submissions, the court concludes that defendants' motion for summary judgment is due to be granted as to all federal claims asserted in this action.  Furthermore, the court will decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims.  Plaintiff's motion for leave to file an amended complaint is due to be denied, and both of the motions to strike will be denied as moot.

## I. STATEMENT OF FACTS[9]

On July 10, 2007, plaintiff, Stephen Alexander, was arrested for public intoxication.[10]  The arresting officer observed plaintiff wandering a busy street in

_____

[6] Doc. no. 55; *see also* doc. no. 49, Ex. 9 (Affidavit of Leonard H. Sims).

[7] Doc. no. 56; *see also* doc. no. 56, Ex. 1 (proposed First Amended Complaint).

[8] Doc. no. 63.

[9] At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party."  *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003).  "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts."  *Id.*; *see also, e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

[10] Doc. no. 49, Ex. 4, at 1-2; doc. no. 49, Ex. 1 (Deposition of Stephen Alexander), at 25 [hereinafter "Deposition of Stephen Alexander"].  The Court has endeavored to recount the facts in the light most favorable to plaintiff to the best of its ability.  However, this task has been made immeasurably more difficult because plaintiff's pinpoint citations in his brief to his own deposition

Muscle Shoals, Alabama, and upon engaging him in conversation, determined that he was under the influence of prescription drugs.[11]  There is no dispute that the arrest was made on the basis of the officer's observations and not pursuant to a warrant.[12] Plaintiff had a history of addiction to the prescription narcotic Oxycodone, and had been detained in the municipal jail of the City of Muscle Shoals on at least two occasions prior to July 2007.[13]  On this occasion, he was too intoxicated to answer the health screening questions posed to him upon his arrest.[14]

---

testimony refer neither to the pages numbers assigned in the transcript itself, nor to the page numbers assigned by the court's Case Management/Electronic Case Filing system.  *E.g.*, Plaintiff's Response to Defendant's Motion for Summary Judgment, at 5, ¶ 43 (disputing that plaintiff was given a t-shirt on July 15, 2007, and citing plaintiff's deposition at "19"; page 19 by the transcripts internal numbering involves a discussion of plaintiff's prior arrests and page 19 by the CM/ECF numbering is the final page containing only the certification of the court reporter who created the transcript). The court has tried in vain to divine how plaintiff has divided up the transcript for purposes of supporting his factual assertions.  Out of an abundance of solicitude, this court has decided not to simply ignore *all of plaintiff's citations to his own deposition transcript*, and has instead made diligent attempts to find the portions of his testimony to which plaintiff refers.  Obviously, this was, at best, a clumsy and extraordinarily time-consuming endeavor.  However, to the extent that the court has not found support for plaintiff's statements of fact and therefore has not included them, the fault must lie at the feet of plaintiff's counsel.

[11] Doc. no. 49, Ex. 4, at 1; Deposition of Stephen Alexander, at 25-26.

[12] Doc. no. 49, Ex. 4, at 1, 3.

[13] Deposition of Stephen Alexander, at 7-8

[14] This fact is included because defendants have posed it and plaintiff has not disputed it. *Compare* Defendants' Brief in Support of their Motion for Summary Judgment, at 4, ¶ 17, *with* doc. no. 58 (Plaintiff's Response to Defendant's Motion for Summary Judgment), at 3, ¶ 17. Nevertheless, the citation defendant has provided, doc. no. 49, Ex. 5, is at least internally contradictory, since "No" boxes are checked indicating that Alexander was not "in Touch with Reality" but *also not* "under the Obvious Influence of Drugs[.]"  *Id.*  In fact, in an example of the kind of poor attention to necessary paperwork that runs like a rotten vein throughout most of this case, it appears that *every* "No" box on the form is checked, including those expressly directed *only to female arrestees. Id.*  As described more fully below, City policymakers and their attorneys would be well-advised to carefully note and exactingly address these problems with their personnel.

4

On the occasions when plaintiff had previously been in the City jail, he had been readily able to secure bond money and bail out.[15]  A few hours after his arrest on July 10, 2007, he called his parents in an attempt to get funds to bail out the next day.[16]  Despite making "two or three" further calls to his parents the following day seeking bail money, plaintiff was unable to bail out.[17]  While plaintiff was making a phone call, one of the jailers then on duty and a defendant in this action, Ashley Jones ("Jones"), noted that plaintiff was behaving strangely and wrote in the Jail Log that she would keep a watch on him.[18]

Between 7:00 p.m. and 7:25 p.m. on July 13, after plaintiff had been incarcerated for three days, plaintiff engaged in an admittedly fake suicide attempt by scraping and stabbing at his wrists and legs with the tines of a plastic fork in the

---

[15] Deposition of Stephen Alexander, at 17-21.

[16] *Id.* at 27.

[17] Doc. no. 49, Ex. 7 (Jail Log of the Muscle Shoals Police Department), at 2 [hereinafter "Jail Log"]; Deposition of Stephen Alexander, at 29.  It is unclear to whom these calls were made.  Alexander claims to have made the calls to his parents.  Plaintiff disputes this fact, but offers no record citation for the proposition.  Doc. no. 58 (Plaintiff's Response to Defendants' Motion for Summary Judgment), at 3, ¶ 25 [hereinafter "Plaintiff's Response to Defendant's Motion for Summary Judgment"].  Pursuant to the Uniform Initial Order entered as doc. no. 30, at 16, and Federal Rules of Civil Procedure 56(c)(1) and (e)(2), this fact is deemed admitted.  Moreover, plaintiff's belated suggestion that his mother Linda Alexander did not receive the calls, does not controvert this assertion since plaintiff himself clearly said he called his "parents," which would include both Ms. Alexander and her husband, plaintiff's father.  *See* doc. no. 65, at 1-2; doc. no. 57, at 7.

[18] Jail Log, at 1; doc. no. 49, Ex. 6 (Deposition of Ashley Jones), at 15.

presence of a jailer then on duty, defendant Charles Sockwell ("Sockwell").[19] According to plaintiff, he genuinely wanted jail personnel to believe that he was attempting suicide because he wanted their attention.[20]   Sockwell called the paramedics and also summoned several officers to aid him in calming plaintiff down.[21]  Plaintiff told Sockwell that he was depressed and suicidal.[22]  Pursuant to the jail's written procedures, plaintiff was put in the "suicide cell," and all items that could be used to harm himself were removed from the cell, including plaintiff's clothing, mattress, and blanket.[23]   Plaintiff physically resisted the removal of his clothes, but ultimately "two or three cops" were able to subdue him and remove his clothing.[24]  All that remained in the cell was a roll of toilet tissue.[25]

According to the records of the fire department personnel who responded to Sockwell's call, plaintiff "had scratched his forearms and picked a scab off of his knee," and he told paramedics that he "needed his depression and blood pressure medicine," and that he "needed to go to the hospital for his depression."[26]   It is

---

[19] Deposition of Stephen Alexander, at 32-33; Jail Log, at 15.

[20] Deposition of Stephen Alexander, at 33-34; Jail Log, at 15.

[21] Jail Log, at 15.

[22] *Id.* at 15.

[23] Doc. no. 8, at 2 (outlining the City's procedure for suicidal inmates); Jail Log, at 15.

[24] Deposition of Stephen Alexander, at 47.

[25] Jail Log, at 15; Deposition of Stephen Alexander, at 35.

[26] Doc. no. 57, Ex. 14, at 2.

undisputed that the marks left on plaintiff's wrists and leg were superficial.[27]  The paramedics advised Sockwell, as their protocol dictated, to have plaintiff transported to the hospital.[28]  The paramedics also offered to contact someone to bring his medication to him, but plaintiff refused and insisted upon going to the hospital.[29]Even so, neither the paramedics nor jail personnel took plaintiff to the hospital.[30]

Sockwell did call plaintiff's parents, however, and left a voicemail message requesting that they bring to the jail any medications that plaintiff took on a regular basis.[31]  On each of the previous occasions when plaintiff had been incarcerated in the municipal jail, plaintiff's parents had, at his request, brought his medications, and jailers had dispensed them to him.[32]  Less than an hour later, at 8:10 p.m., plaintiff's parents arrived with six different medications.[33]  Among the medications delivered was Allopurinol, a treatment for chronic gout.[34]  Sockwell first offered plaintiff his

---

[27] Deposition of Stephen Alexander, at 33-34; Jail Log, at 15; doc. no. 57, Ex. 14, at 2.

[28] Jail Log, at 15; doc. no. 57, Ex. 14, at 2; doc. no. 49, Ex. 10, at 12.

[29] Doc. no. 57, Ex. 14, at 2; doc. no. 49, Ex. 10, at 9.

[30] *See* Jail Log, at 15; doc. no. 49, Ex. 14, at 12, 16.

[31] Jail Log, at 15.

[32] Deposition of Stephen Alexander, at 23.

[33] *Id.*

[34] *See* doc. no. 57, Ex. 14, at 4 (log of medications dispensed to inmates showing plaintiff being given Allopurinol); doc. no. 57, Ex. 12, at 2 (jail card for plaintiff listing his medications); *see also The American Medical Association Guide to Prescription and Over-the-Counter Drugs,* at 221 (stating that Allopurinol is used primarily in the management of gout).

medications at approximately 8:25 p.m., but plaintiff refused to take them.[35]  At 10:30 p.m., Sockwell again offered plaintiff his medications, but plaintiff again refused to take them, saying that he would take his medications only if his shorts were returned to him.[36]  Sockwell told plaintiff that he could not return the shorts.[37]  Ultimately, approximately one hour later, plaintiff finally agreed to take his medications.[38]

At 8:00 a.m. the following morning, July 15, plaintiff appeared to be better and the jailer then on duty, Jones, gave him a pair of boxer shorts.[39]  At 12:45 that afternoon, plaintiff either dropped or threw his meal tray onto the floor and was directed to clean it up.[40]  At some point later that day, plaintiff became cold so he wrapped himself in the remaining toilet paper in his cell "like a mummy."[41]  He requested more toilet paper, but his request was refused.[42]  According to plaintiff, around 4:20 p.m. he had a bowel movement and used his shorts to wipe himself.[43]  He then attempted to flush his soiled shorts down the toilet and continued to flush, flooding the jail and requiring that it be partially evacuated while plumbers addressed

---

[35] *Id.*

[36] Jail Log, at 16.

[37] *Id.*; *see also* doc. no. 49, Ex. 11 (Deposition of Charles Sockwell), at 53-54, 134-37.

[38] *Id.* at 17.

[39] Doc. no. 49, Ex. 6 (Deposition of Ashley Jones), at 50; Jail Log, at 18.

[40] Doc. no. 49, Ex. 6 (Deposition of Ashley Jones), at 57-58; Jail Log, at 22.

[41] Deposition of Stephen Alexander, at 35-36.

[42] *Id.* at 37.

[43] *Id.*

the problem.[44]

Plaintiff testified that on the 15th, the same day as each of the occurrences noted above, his leg began to hurt.[45]   He stated that he immediately began complaining to jailers about the pain.[46]   At some point thereafter, he also began to request medical attention.[47]   Though the Jail Log catalogues numerous other inmate statements regarding pain or the provision of medical treatment, including at least three regarding plaintiff,[48] no entry details plaintiff's complaints about his leg until July 19, 2010, approximately two and a half hours before he was released.[49] Defendant Brown, however, who was on duty at the time, did make the following entry in the Jail Log on the morning of July 16, 2010:   "Stephen Alexander complaining of throwing up.   I told him that I would get him a 7-Up to try to settle

---

[44] *Id.*; Jail Log, at 24-25.  Indeed, it appears that it took several days to address the problem. There is a notation in the Jail Log that plumbers returned at 4:55 p.m. the following day, July 16, Jail Log, at 29, and again three days later on July 18 at 9:20 a.m., there is a notation that plumbers were back to "look at [the] toilet," Jail Log, at 37.

[45] Deposition of Stephen Alexander, at 41-42.

[46] *Id.*

[47] Doc. no. 57, Ex. 9 (Declaration of Stephen Alexander), ¶ 2.

[48] *See* Jail Log, at 12 (stating that jailers were giving an inmate pepto bismol for indigestion), 15 (recounting the visit by paramedics following plaintiff's false suicide attempt), 15-16 ("Candy to Balantine, his sugar is apparently low . . . been complaining all night"; "Four cookies were given to Culliver"); 21 ("Tylenol to Melissa Wix"), 22 (stating that ambulance was called when jailer noticed inmate "shaking in his cell"), 42 (logging plaintiff's statement that he had gout and could have difficulty walking), 43 (logging detainee's complaints about a pain in his jaw and statements of paramedics regarding it); *see also* doc. no. 57, Ex. 13, at 2 (describing the provision of cough drops to one detainee and "PTB [*sic*] Crackers" to a diabetic inmate).

[49] Jail Log, at 42.

his stomach if he wanted me too [*sic*].  All Stephen wanted to do is argue with anything I asked or said to him."[50]

On July 17, the pain grew to the point that Alexander could not stand or walk.[51] Plaintiff complained to the jailers that he was experiencing an outbreak of his chronic gout condition in his leg, that the pain made it impossible for him to stand, and that he needed medical attention.[52]  However, plaintiff concedes that "[i]n order for an inmate to receive medication, he or she must stand up, reach through the bars, take his or her medication, and initial on the [medication log], which the jailer holds on a clipboard."[53]  It is undisputed that, save for two occasions on July 18, Alexander initialed the medication log from July 13 (when his parents delivered his medication to the jail) until July 19 when he was released, including on the morning of his release.[54]  At 9:30 on July 18, defendant Jones gave plaintiff his medication, but did

---

[50] *Id.* at 27.  *Note*: the capitalization of quotations from the Jail Log has been normalized to make them easier to read.

[51] Doc. no. 57, Ex. 9 (Declaration of Stephen Alexander), ¶ 2.

[52] *Id.*; Jail Log, at 42; doc. no. 49, Ex. 12 (Deposition of Captain Michael Poague), at 85.

[53] Doc. no. 58, at 16, ¶ 34; doc. no. 57, Ex. 4, at 11-13.

[54] *See* doc. no. 57, Ex. 13, at 4-7; doc. no. 49, Ex. 6, at 70-71.  The court is unimpressed by plaintiff's contention that a jury could reasonably infer that a stray mark beside plaintiff's initials at 8:30 a.m. on July 16, 2010 indicates that defendant Chris Brown initialed for plaintiff.  *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 16, ¶ 34.  "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."  *Rodriguez v. Farrell*, 280 F.3d 1341, 1353 (11th Cir. 2002) (quoting *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982)).  This is perhaps the most bewilderingly speculative "inference" a plaintiff has ever asked this court to draw.  Plaintiffs' initials clearly appear to be the same handwriting as other entries elsewhere in

not require him to initial the log, and that evening defendant Sockwell initialed for him.[55]  At some point that afternoon, another detainee passed a sheet to plaintiff, and he wrapped himself in it.[56]  After conferring with the shift supervisor on duty, Captain Michael Poague, Sockwell decided to allow plaintiff to keep the sheet.[57]

On the final day of his stay in the jail, July 19, plaintiff told jailers that he had gout and would not be able to walk.[58]  Captain Poague was notified and visited plaintiff's cell.[59]  Captain Poague observed that, rather than gout as plaintiff claimed, plaintiff had a staphylococcus ("staph") infection in his right leg.[60]  However, Captain Poague understood that plaintiff was going to be released following his appearance before the municipal judge in less than three hours.[61]  Not wanting to prolong plaintiff's incarceration any further, Captain Poague made the decision not to seek medical attention until after plaintiff was released.[62]  Captain Poague believed

---

the log made while other jailers were dispensing medication and, more importantly, plaintiff (as opposed to plaintiff's counsel, belatedly and only in a brief) never suggested they were not his handwriting.  *See* doc. no. 57, Ex. 13, at 4.

[55] Doc. no. 57, Ex. 13, at 6-7.

[56] Deposition of Stephen Alexander, at 43-44; doc. no. 57, Ex. 9 (Declaration of Stephen Alexander), ¶ 3; Jail Log, at 38.

[57] Jail Log, at 38.

[58] *Id.* at 42

[59] *Id.*; doc. no. 49, Ex. 12 (Deposition of Captain Michael Poague), at 50-55.

[60] Jail Log, at 42; doc. no. 49, Ex. 12 (Deposition of Captain Michael Poague), at 49-51.

[61] *Id.*

[62] *Id.* at 51-52.

11

plaintiff would seek medical attention as soon as he was released.[63]  Since he could not walk at this point, two other inmates carried plaintiff into court.[64]

As Captain Poague anticipated, Municipal Judge William Marthaler released plaintiff on time served at 6:45 p.m. on July 19, approximately two and one half hours after the staph infection in his leg was first discovered.[65]  Also as Poague had anticipated, plaintiff went to the hospital emergency room immediately following his release.[66]  Plaintiff was not examined by medical personnel until the following morning, however, at least twelve hours after his arrival at Shoals Hospital, when he was treated by Dr. Michael McCormick, who then initiated the standard treatment protocol for staph infections.[67]  When he examined plaintiff, Dr. McCormick discovered an oblong abscess on plaintiff's right thigh, approximately four by six inches in size, that "look[ed] almost like a blister . . . ."[68]  Dr. McCormick also testified that visible symptoms like those plaintiff exhibited when Dr. McCormick

---

[63] *Id.*  Plaintiff disputes this assertion without citation and even though it is plainly supported by the cited deposition transcript.  In any event, *as per* part D.2.a of Appendix II of the Uniform Initial Order entered as doc. no. 30, at 16, and Federal Rules of Civil Procedure 56(c)(1) and (e)(2), this fact is deemed admitted.

[64] Deposition of Stephen Alexander, at 51.

[65] Jail Log, at 42; Deposition of Stephen Alexander, at 44-45.

[66] Doc. no. 49, Ex. 13 (Shoals Hospital admission documents for plaintiff).

[67] Doc. no. 49, Ex. 14 (Deposition of Dr. Michael McCormick), at 9, 20-24, 42-43, 46.

[68] Doc. no. 57, Ex. 15, at 1; doc. no. 49, Ex. 14, at 17-18.

12

first examined him could develop in "less than a day."[69]   Plaintiff remained

hospitalized for six days thereafter,[70] but made a full recovery.[71]

It is undisputed that, prior to the incident at issue in this action, plaintiff had

a history of both staph infections and gout, and sometimes required the aid of a

walker to get around.[72]   He was declared disabled by the Social Security

Administration in 1994.[73]   It is similarly undisputed that at no time between being

arrested without a warrant on the afternoon of July 10, 2007, and his release on the

afternoon of July 19, 2007, was plaintiff ever brought before a judicial officer for any

purpose, nor was there ever a judicial determination that probable cause existed for

his arrest.[74]

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

---

[69] *Id.* at 43-46.

[70] *Id.* at 46.

[71] *Id.* at 49.

[72] *E.g.*, Deposition of Stephen Alexander, at 10-11, 52-53; doc. no. 57, Ex. 8 (Deposition of Linda Alexander), at 13.

[73] Deposition of Stephen Alexander, at 14-15.

[74] *E.g.*, Defendants' Brief in Support of their Motion for Summary Judgment, at 20-21 (not disputing that Alexander did not receive an initial appearance, but arguing only that there was no policy or custom necessary for municipal liability for that denial to attach); Defendants' Reply Brief in Support of their Motion for Summary Judgment, at 6-7.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[75]

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material to an issue affecting the outcome of the case*. The relevant rules of substantive law dictate the

---

[75] Rule 56 was amended, effective December 1, 2010, in conjunction with a general revision of some of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "*will not affect continuing development of the decisional law* construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## III.  DISCUSSION

### A.    Defendants Due to Be Dismissed

Initially, the court will address those defendants that plaintiff admits are due to be dismissed.  Plaintiff has conceded that there is insufficient evidence to support any claim against the following nine defendants and, accordingly, that summary judgment in favor of these defendants is appropriate:  Police Chief Robert Evans; Police Officers Eddie Lang and Tommy Skipworth; and, City Council Members Jonathon Terry, Joe Pampinto, Neal Willis, Jerry Knight Grissom, James Holland, and Allen Noles.[76]

Defendants also contend that plaintiff has agreed that summary judgment

---

[76] Doc. no. 58, at 1.  Confusingly, defendants list a markedly *different* group of defendants in their brief that they claim plaintiff "acknowledged . . . were due to be dismissed."  Doc. no. 49, Ex. 1 (Defendants' Brief in Support of their Motion for Summary Judgment), at 9-10.  Nevertheless, as the relevant concession is plaintiff's, this court will ignore defendants' misstatement of the list of defendants in whose favor plaintiff has agreed that summary judgment is appropriate and instead rely exclusively upon plaintiff's list.

should be granted in favor of David H. Bradford, Mayor of the City of Muscle Shoals.[77]   Paradoxically, Mayor Bradford appears never to have been listed as a defendant in the caption of this case in any document filed by any party or entered by this court — including the complaint and both parties' summary judgment briefing.[78] Nor has Mayor Bradford ever appeared in the listed defendants atop the docket sheet for this action.   Nonetheless, in the text of the complaint itself, plaintiff *did* include Mayor Bradford in the description of the parties.[79]   Plaintiff seems never to have noticed that one of the individuals he purports to have sued was never actually listed as a defendant in any filing.   In any event, plaintiff never responded to defendants' assertion that he had agreed to summary judgment as to all claims asserted against Mayor Bradford and, indeed, never mentioned Mayor Bradford in his response to defendants' motion for summary judgment.   Therefore, any argument to the contrary is waived, and any claims against Mayor Bradford that may have existed are due to be disposed of.   *Norelus v. Dennys, Inc.*, — F.3d —, No. 07-14077, 2010 WL 5298847, at *24 (11th Cir. Dec. 28, 2010) ("[T]he law [is] by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is

---

[77] Defendants' Brief in Support of their Motion for Summary Judgment, at 9.

[78] *See, e.g.*, doc. no. 1, at 1; Defendants' Brief in Support of their Motion for Summary Judgment, at 1; Plaintiff's Response to Defendants' Motion for Summary Judgment, at 1.

[79] Doc. no. 1, ¶ 13.

deemed abandoned and its merits will not be addressed.") (citation and quotation marks omitted).

The only remaining defendants, as plaintiff acknowledges, are the City of Muscle Shoals and Jailers Chris Brown, Ashley Jones, and Charles Sockwell. The individual defendants are sued in their individual capacities.[80]

## B.    Plaintiff's Motion to Amend His Complaint.

Before addressing the merits of the remaining defendants' motion for summary judgment as to all claims asserted against them, the court must first determine what claims are, in fact, asserted against them. On the same day that plaintiff filed his response to defendants' motion for summary judgment, he also moved for leave to amend his complaint.[81]   Plaintiff's proposed amended complaint contains a few cosmetic changes that are not at issue: deleting from the caption those defendants against whom plaintiff admits he has insufficient evidence, and from the body of the complaint a count that plaintiff has abandoned.[82]   However, it also contains one major, substantive change to which defendants have strenuously objected.[83]   It adds

[80] *See* doc. no. 58, at 1-2; *see also* doc. no. 56, Ex. 1, at 1 (plaintiff's proposed First Amended Complaint listing, in the proposed new caption of the case, only these four as defendants).

[81] Doc. no. 56 (filed September 7, 2010). *Cf.* doc. no. 58 (Plaintiff's Response to Defendants' Motion for Summary Judgment) (filed September 7, 2010).

[82] *See* doc. no. 56, Ex. 1 (proposed First Amended Complaint), at 1, 7. The deleted cause of action, "Deliberate Indifference to Health/Safety," will be discussed in further detail below. *Cf.* doc. no. 1, ¶¶ 53-54.

[83] *See generally* doc. no. 61.

17

a new cause of action against the City, alleging that the municipality systemically failed to provide prompt judicial determinations of probable cause to individuals arrested without a warrant, including plaintiff, in violation of their rights under the Fourth Amendment.[84]

On November 24, 2009, this court entered a Scheduling Order stating in its first paragraph that no further causes of action could be added.[85]  That order also alerted the parties that its terms would not be altered save for good cause shown.[86]  A "plaintiff seeking leave to amend [his] complaint after the deadline designated in a scheduling order must demonstrate 'good cause' . . . ." *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241 (11th Cir. 2009) (bracketed alterations added). "[L]ack of diligence . . . *precludes a finding of good cause*" when a plaintiff had all of the factual information upon which a proposed amendment is based, or "fail[ed] to seek the information [he] need[ed] to determine whether an amendment [was] in order." *Id.* at 1241 n.3 (emphasis supplied) (bracketed alterations added).  Where leave to amend is sought after discovery has closed and summary judgment motions have been filed, the burden on a plaintiff to explain why he waited so long is significantly heavier, especially when the plaintiff seeks to add a new claim.  *See id.*

---

[84] Doc. no. 56, Ex. 1, ¶ 40 (Count II).

[85] Doc. no. 36, ¶ 1.

[86] *Id.* at 1.

at 1242-43; *Lowe's Home Centers, Inc. v. Olin Corp.*, 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions.").

Here, plaintiff's motion for leave to amend seeks to add a new claim well over a year after the complaint was filed,[87] five months after the deadline originally set for completion of all discovery,[88] two months after that twice-extended deadline had actually passed,[89] and a month after defendants' timely-filed motion for summary judgment as to all claims that had, at that point, been asserted against them. Plaintiff asserts that the reason for such an extensive delay in seeking leave to amend "is attributable to the undersigned's poor understanding of criminal procedure and inexperience pursuing this type of civil rights claim."[90] Plaintiff contends that his admittedly "piss-poor complaint"[91] resulted from his attorney's confusion about the distinction between a judicial determination of probable cause for individuals held after a warrantless arrest and an initial appearance before a judicial officer afforded

---

[87] *Compare* doc. no. 1, at 1 (filed July 13, 2009), *with* doc. no. 56 (motion for leave to amend filed September 7, 2010).

[88] Doc. no. 36, ¶ 2.

[89] *See* Order of February 19, 2010; Order of March 19, 2010.

[90] Doc. no. 56, ¶ 3.

[91] Plaintiff's Response to Defendant's Motion for Summary Judgment, at 20. While this self-description of the quality of plaintiff's counsel's work in the present case may be accurate, this court admonishes counsel to eschew such language in any future pleadings filed in this, or any other, court.

to all detainees to inform them of the charges against them.  Yet, other than reiterating his confusion, plaintiff's counsel does not explain why he did not seek leave to amend at least as early as three weeks before discovery closed when City Magistrate Vonda Green, in response to his plainly muddled question in a deposition, clearly stated that: "probable cause and initial appearance is [*sic*] two different things."[92]  Additionally, of course, even half an hour's research at any time during the fourteen months the case had been pending prior to this motion for leave to amend would have instructed plaintiff's counsel as to the distinction.

A lawyer's failure to properly inform himself of the legal bases for the actions he files hardly constitutes "good cause" for allowing him to circumvent a court order. The fact that the "confusion" continued for the entire pre-trial life of this suit is not excusable.  "[I]n order to ensure the orderly administration of justice, [a court] has the authority *and responsibility* to set and enforce reasonable deadlines."  *Lowe's Home Centers Inc.*, 313 F.3d at 1315 (emphasis supplied).

The prompt judicial determination of probable cause upon which plaintiff's claim is premised is required only for persons arrested without a warrant.  *See Powell v. Nevada*, 511 U.S. 79, 83 (1994).  Plaintiff's original complaint never used the word

---

[92] Doc. no. 57, Ex. 1 (Deposition of Vonda Green), at 19.

"warrant."[93]  Further, that right is secured by the Fourth Amendment, whereas the right to an initial appearance is secured by the Due Process Clause of the Fourteenth Amendment.  *See Baker v. McCollan*, 443 U.S. 137, 144-45 (1979); *see also Armstrong v. Squadrito*, 152 F.3d 563, 569-70, 572, 581-82 (7th Cir. 1998).  The original complaint made no reference at all to the Fourth Amendment or why it might be implicated.[94]  At the very least, a complaint must put a defendant "on notice as to the claim being asserted against him and the grounds on which it rests."  *Sams v. United Food & Commercial Workers Intern. Union, AFL-CIO, CLC*, 866 F.2d 1380, 1384 (11th Cir. 1989).  Plaintiff's complaint failed even to do that throughout the

---

[93] Doc. no. 1, *passim*.  The significance of whether an arrest was made with or without a warrant — an issue plaintiff ignored both in his complaint and that plaintiff's counsel largely (and fatally) ignored throughout the course of this case and the discovery conducted in it — was made abundantly clear in the Supreme Court's decision in *Baker v. McCollan*, 443 U.S. 137 (1979):

> By virtue of its "incorporation" into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The probable-cause determination "must be made by a judicial officer either before or promptly after arrest." *Id.* at 125, 95 S.Ct. at 869.  Since an adversary hearing is not required, and since the probable cause standard for pretrial detention is the same as that for arrest, a person arrested pursuant to a warrant issued by a magistrate on a showing of probable-cause is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial.

*Id.* at 142-143.  As described more fully in note 95 *infra*, plaintiff's deposition questions, presumably designed to elucidate the City's alleged custom of failing to provide prompt judicial determinations of probable cause following arrest, fail almost without exception to recognize that such a determination *is only constitutionally required* (and accordingly could only serve as the basis for a claim under § 1983) in the instance of a *warrantless* arrest.

[94] *Id.*

entirety of the discovery period.  This court will not countenance plaintiff's assertion that, despite this fact, "[d]efendant should not be prejudiced" by this eleventh hour amendment.[95]

Nor is this court willing to reopen discovery, as would unquestionably be necessary, in a fourteen-month-old case during which plaintiff has had ten months of discovery and more than ample time for his counsel to have corrected his "confusion" regarding the law underpinning the suit he filed.[96]  The court is unimpressed with counsel's suggestion that he should be excused from his professional obligations, and given a pass from any semblance of compliance with this court's orders, on the basis of inexperience when even a cursory search of the court's files discloses that he has been involved in well over two-hundred cases in this district alone, including dozens

---

[95] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 20; doc. no. 56, ¶ 1.  The court will also note that plaintiff's counsel's apparent implication that no further discovery would be necessary because "the issue has been thoroughly litigated" is not borne out by the record. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 20; doc. no. 56, ¶ 1. Counsel's confusion about what a probable cause hearing is and when it is required so infect all of the discovery that this court could not possibly determine whether a genuine issue of fact exists regarding whether the City had a policy or custom of failing to afford warrantless arrestees with prompt judicial probable cause determinations.  *See* doc. no. 49, Ex. 3 (Deposition of Municipal Judge William Marthaler), at 28-29, 49-50 (discussing probable cause hearings only in a way that was primarily focused on whether they would have noticed medical needs like those at issue in plaintiff's deliberate indifference claim); doc. no. 56, Ex. 3 (Deposition of former Magistrate Booby Gene Muse), *passim* (using the word "warrant" in any form only once, on page 39, over the course of nearly 70 pages of deposition transcript); doc. no. 56, Ex. 1 (Deposition of Magistrate Vonda Green), at 6, 11, 18 (discussing probable cause only three times and never discussing warrants or the lack thereof in any sort of relevant fashion).

[96] *See* doc. no. 61, ¶ 5.

based on § 1983. Accordingly, plaintiff's motion for leave to file an amended complaint, filed well beyond all deadlines and entirely unsupported by good cause, is due to be denied.

That said, the City concedes that plaintiff was arrested without a warrant and did not receive a probable cause hearing. Plaintiff was incarcerated in the municipal jail for nine days. When the government holds an individual in detention, a "judicial determination of probable cause" must generally be made "within 48 hours of [a] warrantless arrest; absent extraordinary circumstances, a longer delay violates the Fourth Amendment." *Powell*, 511 U.S. at 80 (citing *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)); *see also Lawhorn v. Allen*, 519 F.3d 1272, 1287 (11th Cir. 2008). Even in his proposed amended complaint plaintiff did not allege a § 1983 claim against any responsible individual official for this violation,[97] but had he done so it is clear he would succeed because it is undisputed that his Fourth Amendment right to a probable cause determination was violated.[98] It is equally clear from the record before the court that, at the very least, the City did an extraordinarily poor job of cataloguing that constitutionally-required prompt judicial determinations

---

[97] Doc. no. 56, Ex. 1, ¶ 40.

[98] Doc. no. 61, ¶ 4.

of probable cause were afforded to warrantless arrestees.[99]   In short, the City, its officials, and its attorneys are lucky that they confronted a hapless plaintiff in this instance, and should consider this suit a warning shot across the bow.

## C.   Defendants' Motion for Summary Judgment

### 1.   Deliberate indifference to health and safety

Plaintiff's original complaint contained allegations that the individual jailer defendants violated his constitutional rights by knowingly subjecting him to "unsanitary and inhumane conditions of . . . confinement . . . ."[100]   According to the complaint, this deprivation was "directly attributable to one or more customs and/or policies of the City" and, therefore, the City is also liable.[101]   This claim, contained in Count II, contained language duplicating the allegations in Count I:  namely, that the jailers "were deliberately indifferent to plaintiff's serious medical needs," and that the City was liable because the alleged denial of treatment was attributable to a policy or custom.[102]

Defendants argue that summary judgment is due to be granted as to the claims

---

[99] *See, e.g.*, doc. no. 49, Ex. 3 (Deposition of Municipal Judge William Marthaler), at 10-11 ("Q: . . . [H]ave you ever seen any documentation . . . that anybody ever received a probable cause hearing?  A:  I have not."); doc. no. 57, Ex. 3 (Deposition of former Magistrate Bobby Gene Muse), at 29-33.

[100] *Id.* ¶ 53.

[101] *Id.* ¶ 54.

[102] *Id.* ¶¶ 51-52.

in Count II.[103]  Though plaintiff is not explicit about so doing, he appears to have

conceded that defendants are correct and has abandoned the claim contained in Count

II, at least to the extent that claim diverges from the allegations it shares with Count

I.[104]  In any event, plaintiff marshals no argument whatsoever supporting this claim

in his response to defendants' motion.  It is well settled that, "[i]n opposing a motion

for summary judgment, a party may not rely on his pleadings to avoid judgment . . .

. [T]he onus is upon the parties to formulate arguments; grounds alleged in the

complaint but not relied upon in summary judgment are deemed abandoned . . . ."

*Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted).  Plaintiff has abandoned his claim that

defendants were deliberately indifferent to his health or safety and, accordingly,

summary judgment is due to be granted as to Count II.

### 2.    Failure to provide an initial appearance

Count III of the complaint alleges that plaintiff's nine-day detention without

a "prompt [initial] appearance before a judicial officer" deprived him of "his rights

as a pretrial detainee under the Fourteenth Amendment to the Constitution of the

---

[103] Defendants' Brief in Support of their Motion for Summary Judgment, at 16-17.

[104] *Cf.* doc. no. 56, ¶ 4 (seeking to amend the complaint to "eliminate[] . . . one cause of action . . . ."); doc. no. 56, Ex. 1, at 6-7 (excising the claims previously contained in Count II from the proposed amended complaint).

United States in violation of 42 U.S.C. § 1983."[105]   Plaintiff initially pled this violation against both the City and certain individual defendants.[106]   However, plaintiff has agreed to the dismissal of each of the individual defendants against whom this count was pled.[107]   Therefore, the only remaining defendant that plaintiff asserts is liable for violating his Fourteenth Amendment right to an initial appearance is the City.

In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the case that first established the Fourth Amendment right to a prompt judicial determination of probable cause for pretrial detention following a warrantless arrest, the Supreme Court recognized that "[t]he consequences of prolonged detention may be more serious than the interference occasioned by arrest." *Id.* at 114.   Four years later, the Court held that a three-day detention following the mistaken arrest of an individual based upon a misidentification, but pursuant to an otherwise valid warrant, did not violate due process. *Baker v. McCollan*, 443 U.S. 137, 144-47 (1979).   This was so because the

---

[105] Doc. no. 1, ¶ 55.

[106] *Compare id.* (attributing the violation to "[t]he mayor and city council defendants"), *with id.* ¶ 56 ("The constitutional violation is directly attributuable to one or more customs and/or policies of the City described above.").

[107] *See* doc. no. 58, at 1; *see also* discussion, *supra*; Plaintiff's Response to Defendants' Motion for Summary Judgment, *passim* (containing no argument that any of the individual defendants are liable for this alleged violation of plaintiff's constitutional rights); *cf.* doc. no. 56, Ex. 1, ¶ 41 (restricting alleged liability for the failure to afford an initial appearance in the proposed amended complaint to the City).

existence of a valid warrant, even when officials are mistaken as to the identity of the individual arrested pursuant to it, constitutes the legal process that the Constitution requires. *Id.* at 143-44. However, in passing, the Court in *Baker* stated that:

> Obviously, one . . . could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. For the Constitution likewise guarantees an accused the right to a speedy trial, and invocation of the speedy trial right need not await indictment or other formal charge; arrest pursuant to probable cause is itself sufficient. *United States v. Marion*, 404 U.S. 307 (1971). We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.' [U.S. Const. amend. XIV, § 1].

*Id.* at 144-145 (first and second alterations supplied) (parallel citations omitted).

Based in part upon these *dicta* from *Baker* and *Gerstein*, the Seventh Circuit held that arrestees have a substantive due process right to an initial appearance before a judicial officer. *E.g.*, *Coleman v. Frantz*, 754 F.2d 719 (7th Cir. 1985), *abrogated in part on other grounds by Benson v. Allphin*, 786 F.2d 268, 279 n.26 (7th Cir. 1986). A reasonably prompt initial appearance before a judicial officer is a requirement in every state, and the Seventh Circuit carefully outlined how the information imparted to a detainee at such an appearance "serves to enforce or give meaning to important individual rights that are either expressly granted [in the

Constitution] or are set forth in Supreme Court precedent." *Id.* at 724 (alteration added). These include informing the detainee of the charge(s) against him and his right to counsel, as required by the Sixth Amendment; informing the detainee of the rights secured him by the privilege against self-incrimination of the Fifth Amendment; and setting or reviewing the detainee's bail to guarantee consistency with the Excessive Bail Clause of the Eighth Amendment. *Id.* "[A]n extensive detention without a first appearance substantially impinges upon and threatens all of these rights." *Armstrong v. Squadrito*, 152 F.3d 564, 573 (7th Cir. 1998). "Therefore, as a matter of constitutional prophylaxis, the denial of a first appearance offends the Due Process Clause." *Id.*

Such claims premised upon a governmental entity's extended failure to afford a detainee an initial appearance are examined through the prism of substantive, as opposed to procedural, due process. *Id.* at 572. The Eighth Circuit has adopted the Seventh Circuit's analysis, *e.g.*, *Hayes v. Faulkner County, Ark.*, 388 F.3d 669, 673-75 (8th Cir. 2004), and several district courts have either explicitly or implicitly done so as well. *E.g.*, *Sanchez v. Campbell*, No. 4:09-CV-420-SPM-WCS, 2010 WL 547620, at *3 (N.D. Fla. Feb. 10, 2010) ("Plaintiff's five day detention prior to first appearance, pursuant to a valid arrest warrant for which the Plaintiff was properly identified, . . . does not rise to the level of an unconstitutional deprivation of the

Plaintiff's liberty in contravention of the Fourteenth Amendment."); *Afeworki v. Thompson*, No. C06-628MJP, 2007 WL 2572293, at *3-5 (W.D. Wash. Sept. 5, 2007) (holding that seventeen-day delay between arrest pursuant to valid warrant did not amount to a due process violation); *Jackson v. Hamm*, 78 F. Supp. 2d 1233, 1241 (M.D. Ala. 1999) (finding that twenty-eight day detention pursuant to valid warrant prior to first appearance amounted to a substantive due process violation, but that qualified immunity entitled defendants to summary judgment because such a right was not clearly established in the Eleventh Circuit).

As a preliminary matter, it is entirely unclear (and plaintiff has set forth essentially no argument addressing) whether these cases and the due process right they recognize are applicable under the factual circumstances of this case.  All of these cases involved arrests pursuant to a facially valid warrant, such that the antecedent Fourth Amendment questions were moot and, instead, the Due Process Clause of the Fourteenth Amendment alone governed the contours of the relevant right.  *E.g.*, *Armstrong*, 152 F.3d at 581-82 (stating that "this case invokes the . . . substantive due process right identified in *Coleman*" because the plaintiff had been detained pursuant to the functional equivalent of a criminal warrant); *Hayes*, 388 F.3d 669 at 672 (stating that the plaintiff was "arrested on the warrant"); *Jackson*, 152 F. Supp. 2d at 1236 (same).  When, as here, a detainee was arrested in the course of the

commission of a crime and without a warrant, any due process right to an initial appearance may be subsumed by the Fourth Amendment right to a prompt judicial determination of probable cause.  *Cf. Powell v. Nevada*, 511 U.S. 79, 81, 83-85 (1994) (making no comment with respect to four-day delay between detention and first appearance before a judicial officer under the Due Process Clause and, instead, holding only that failure to render prompt judicial determination of probable cause violated the Fourth Amendment); *County of Riverside v. McLaughlin*, 500 U.S. 44, 47-48, 57-59 (1991) (examining possible ten-day delay in warrantless arrestees' appearance before a judicial officer as a Fourth Amendment violation and making no reference, even in *dicta*, as to possible due process requirements).  Further, all of the cases addressing the right plaintiff here invokes have involved officials' indifference to a detainees' protests of innocence or, at the very least, their protests about the lack of a prompt appearance.  The Seventh Circuit "consider[ed a protest to officials] an important factor because the Supreme Court conspicuously noted it in *Baker*," the decision from whose *dicta* the court had divined the existence of a due process right to an initial appearance.  *Armstrong*, 152 F.3d at 575 (alterations added).  Here, plaintiff was not arrested pursuant to a warrant and appears never to have protested his detention as it was occurring.

Nevertheless, the court need not address the precise contours of the right

30

plaintiff is asserting since it is plain that he has failed to muster sufficient evidence to create a jury question on an essential element of the claim he pleads. "[E]ven conduct by a government actor that would amount to an intentional tort under state law will rise to the level of a substantive due process violation only if it also 'shocks the conscience.'" *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003) (quoting *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002)).

> Conduct by a government actor [as opposed to statutes enacted by a legislature] will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience-shocking in a constitutional sense. *See* [*County of Sacramento v.*] *Lewis*, 523 U.S. [833,] 847 [(1998)]. The concept of conscience-shocking conduct "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. The Supreme Court has made clear "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* Thus, "the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." *Neal v. Fulton County Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000) (citing *Lewis*, 523 U.S. at 848). To rise to the conscience-shocking level, conduct most likely must be "intended to injure in some way unjustifiable by any government interest[.]" *Lewis*, 523 U.S. at 849, 118 S.Ct. at 1718.

*Davis v. Carter* 555 F.3d 979, 982 (11th Cir. 2009) (some alterations supplied) (parallel citations omitted), *overruled in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). The Supreme Court has counseled great caution in

making decisions whether "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).[108]

Further, liability under § 1983 for constitutional violations will only attach to a municipality, like the City, "where [the] municipality's *own* violations were at issue but not where only the violations of *others* were at issue." *Los Angeles County v. Humphries*, — U.S. —, 131 S. Ct. 447, 453 (2010) (emphasis in original) (alterations supplied). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978). Thus, "[t]o impose § 1983 liability on a municipality, a plaintiff must show:  (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *T.W. ex rel. Wilson v. School Board of Seminole County*, 610 F.3d 588, 603 (11th Cir. 2010) (quoting *McDowell v. Brown*,

---

[108] Every decision the court examined regarding a claim of this variety recited the "shocks the conscience" test. *See Sanchez*, 2010 WL 547620, at *2 (collecting cases under this uncertain theory that have applied the "shocks the conscience" test). Astonishingly, *neither of the parties ever discussed the correct test*. This may simply have been because neither party seems to have understood exactly what claim plaintiff was making or what it entailed, including plaintiff himself. Nonetheless, Supreme Court precedent, Eleventh Circuit caselaw, and the decisions of every court analyzing such a claim of this variety have utilized this species of analysis and, accordingly, the court will apply the actual law, not the convoluted jumble of irrelevant standards in which both parties appear to have been ensnared.

392 F.3d 1283, 1289 (11th Cir. 2004)).

Moreover, where the claimed right that a plaintiff claims a municipal entity violated arises from the substantive component of the Due Process Clause, the municipality's deliberate indifference to the constitutional right must, itself, "shock the conscience." *E.g.*, *Collins*, 503 U.S. at 128 ("We also are not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."); *Lund v. Hennepin County*, 427 F.3d 1123, 1126 (8th Cir. 2005) ("[E]stablishing a violation of due process as a basis for municipal liability under § 1983 requires plaintiff to show more than mere negligence or unreasonableness; a plaintiff must point to conduct by the municipality, or by employees acting with its knowledge, that shocks the conscience given the totality of the circumstances.") (citing, *inter alia*, *Hayes*, 388 F.3d at 674); *Waddell*, 329 F.3d at 1305 ("[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense."); *Armstrong*, 152 F.3d at 581 (applying the "shocks the conscience" test to a claim nearly identical to the one at issue here). *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our

33

concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.").

Accordingly, to survive summary judgment, plaintiff must provide enough evidence from which a jury could conclude not only that the nine-day delay between his arrest and the time he was brought before a judge was so severe as to shock the conscience, but also that the City maintained a policy or custom that both led to the violation of his rights, and that the policy or custom itself was conscience-shocking. This he has not done.

Plaintiff bases his claim first upon his assertion that the City's magistrates were not conducting initial appearances within 72 hours, as required by Alabama Rule of Criminal Procedure 4.3.[109]  It is axiomatic, however, that § 1983 provides no cause of action for violation of state-law procedural requirements, even if those requirements were instituted in part to ensure compliance with the federal Constitution.  Rights "created only by state law . . . are not subject to substantive due process protection  . . . because substantive due process rights are created only by the Constitution." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (*en banc*) (quotations and citation omitted).  "[V]iolation of state law . . . is not enough by itself

---

[109] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 23.

to support a claim under section 1983." *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002); *see also Vaughn v. City of Athens*, 176 Fed. Appx. 974, 976 (11th Cir. 2006) (holding "immaterial" a claimed Fourteenth Amendment due process right under Alabama tort law).

Second, plaintiff contends that the City's failure to release individuals on a minimum bond if they received no initial appearance evidences the City's deliberate indifference, constituting a custom of denying individuals their due process rights to such an appearance.[110]   Again, this supposed "right" is simply an element of *Alabama's* procedures for processing recent arrestees and, save for describing the means by which Alabama officials can meet their constitutional requirements, has *nothing at all to do with the Federal Constitution*.  Further, to borrow Judge Posner's apt turn of phrase, plaintiff's "belief [merely] reflects the persistent fallacy that procedural requirements create substantive entitlements, although the Supreme Court and this court keep insisting they don't." *Villanova v. Abrams*, 972 F.2d 792, 798 (7th Cir. 1992).  That the City's magistrates did not deviate from the bail schedule set by the municipal judge without his prior consent is utterly irrelevant to whether they were conducting the initial appearances the Constitution requires.[111]

---

[110] *Id.* at 23-24.

[111] *Id.* at 24.  Any assertion that the bail terms provided to detainees were unconstitutionally high would be addressed through the prism of the Eighth Amendment's Excessive Bail Clause.  *See City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 200-201

Similarly, the question of whether "the municipal judge retained authority and control over the release of inmates" and the issue of whether the magistrates would not release detainees without prior approval are both wholly irrelevant. The constitutional violation plaintiff claims is the failure to afford detainees an initial appearance in a reasonably prompt manner — "a process to an end; the hearing itself will not assure release" — yet the facts to which plaintiff points simply argue he should have been released sooner based upon requirements of Alabama law, an issue wholly distinct from a substantive right to a judicial appearance. *See Jackson*, 78 F. Supp. 2d at 1242-43.

Plaintiff does not contend the City had a policy of refusing to provide arrestees with an initial appearance before a judicial officer, but does proffer the bare assertion that the City maintained "an established municipal practice of not conducting initial appearances at all."[112] "[T]o succeed on a § 1983 claim against [a municipal entity] in the absence of an official policy . . . [the plaintiff] must 'prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003) (alterations

---

(2003) ("*Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989), precludes the use of "'substantive due process'" analysis when a more specific constitutional provision governs."). Plaintiff has neither pled nor argued such a claim.

[112] Doc. no. 58, at 23.

added) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  The court has examined the portions of the record to which plaintiff points in his statement of facts and finds that these, at best, show that the City did not maintain the paperwork proving that appearances were given within 72 hours.[113]  There is some hearsay testimony that first appearances were not afforded within that time frame.[114]  All of the deposition testimony to which plaintiff points is fatally confused as a result of plaintiff's counsel's conflation of state procedural requirements and the 48-hour period during which a probable cause determination should be made for warrantless

---

[113] *See* doc. no. 49, Ex. 3 (Deposition of Municipal Judge William Marthaler), at 13-14; doc. no. 57, Ex. 3 (Deposition of Magistrate Bobby Gene Muse), at 34-43 (relating that Muse claims to have conducted initial appearances but recognizing that there were jail cards that did not reflect that the initial appearances had been done).  As with plaintiff's unpled Fourth Amendment claim, there are troubling inferences to be drawn from the record as to the promptness with which detainees were afforded their appearances.  Nonetheless, plaintiff's citations plainly fail to create a genuine issue of fact regarding his assertion that the City maintained a custom of failing to provide detainees with appearances, even though it is possible that such a custom did in fact exist.  A litigant on summary judgment cannot shift their burden to the court by simply referring generally to the existence of "evidence" in voluminous exhibits, large portions of which are not addressed in his brief, with the expectation that the court will unearth any beneficial evidentiary nuggets that the filer may have neglected to mention.  *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1068 (S.D. Ala.2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Carolina Acquisition, LLC v. Double Billed, LLC*, 627 F. Supp. 2d 1337 (S.D. Fla. 2009) ("Federal judges are not archaeologists.  We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment.") (citation omitted).  Accordingly, the Court will not squander scarce resources sifting through hundreds of pages of evidence for the thread of an alleged municipal custom where plaintiff has only proffered the bald assertion that one existed, bolstered by no direct citation whatsoever and hardly even gestured towards in the mutant blunderbuss assertions of "fact" in the "facts" portion of his brief.

[114] *See, e.g.*, doc. no. 57, Ex. 1 (Deposition of Magistrate Vonda Green), at 20-25, 32 ("I've heard it.  I mean, I don't have personal knowledge.").

arrests, with the entirely independent substantive due process right to an initial appearance.[115]  Moreover, even assuming the City maintained a policy that resulted in individuals not being afforded initial appearances in a manner compliant with the Alabama Rules of Criminal Procedure, plaintiff concedes that all new detainees who were not released on bond would be brought to Municipal Court, held on most Thursdays.[116]  All reported cases finding liability for violation of the substantive due process right to which plaintiff points have involved significantly longer periods of detention without an initial appearance.  *E.g.*, *Hayes*,  388 F.3d at 674-75 (holding thirty-eight day pre-appearance detention violated due process); *Armstrong*, 152 F.3d at 577-79 (fifty-seven day detention on civil warrant without an initial appearance constituted a substantive due process violation); *Coleman*, 754 F.2d at 724-25 (eighteen day detention for non-detainable offenses without appearance before magistrate constitutes unconstitutional deprivation of liberty); *Jackson*, 78 F. Supp. 2d at 1238, 1241-43 (twenty-eight day detention prior to first appearance violated right); *cf. Afeworki*, 2007 WL 2572293, at *6 (W.D. Wash. 2007) (seventeen day delay between arrest and first appearance did not shock the conscience); *Pledger v. Reece*, No. 04-3084, 2005 WL 3783428, at *4 (W.D. Ark. Nov. 10, 2005) (fifteen day

---

[115] *E.g.*, *id.* at 19-24.

[116] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 9.

delay in release did not amount to Due Process violation).

This court need not attempt to prognosticate whether the Eleventh Circuit would recognize the existence of the right here at issue under the relatively stringent analytical gauntlet asserted liberty interests must survive to achieve "substantive-due-process" status.  There is simply no evidence that city officials regularly failed to provide detainees with an initial appearances before a judicial officer in such a fashion as to constitute a policy of deliberate indifference to their rights that shocks the conscience.  Accordingly, because plaintiff has not proffered enough evidence from which a jury could determine that the City committed an actionable constitutional violation, even if the court assumes, for the sake of argument, that such a claim exists, summary judgment still is due to be granted as to Count III of plaintiff's complaint.

### 3.    Deliberate indifference to serious medical needs

In Count I of his complaint, plaintiff also alleged that defendants were deliberately indifferent to his serious medical needs in violation of his due process rights as a pretrial detainee under the Fourteenth Amendment to the Constitution.  As all of the other defendants against whom this claim was levied have been dismissed, the court need only address this allegation with respect to the remaining defendants, jailers Brown, Sockwell, and Jones, and the City of Muscle Shoals.

> Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Correctional officers [like the jailer defendants in this action] are, of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [plaintiff]. *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir. 2005). However, the standards under the Fourteenth Amendment are identical to those under the Eighth. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005).

*Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (parallel citations omitted, bracketed alterations added). Since the standards are the same regardless of whether the plaintiff is a pretrial detainee or a convicted prisoner, the Eleventh Circuit has stated that the court is to rely upon law from both contexts in deciding claims like the present one. *Id.*

To prevail on a claim of this variety, a plaintiff must show: (1) a serious medical need; (2) defendants' deliberate indifference to that need; and (3) a causal link between the defendants' indifference and his injury. *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). In order to establish deliberate indifference on the part of a defendant, a plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Townsend v. Jefferson County*, 601 F.3d

1152, 1158 (11th Cir. 2010) (internal quotation marks and alteration omitted).

With respect to the "subjective knowledge" component, the Eleventh Circuit has held that defendants "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* must also draw the inference." *Bozeman v. Orum*, 422 F.3d, 1265, 1272 (11th Cir. 2005) (emphasis in original) (citation, internal quotation marks, and alteration omitted). "No liability arises for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . . .'" *Burnette v. Taylor*, 533 F.3d 1325, at 1331 (11th Cir. 2008) (omission in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 825 (1994)).

In determining whether a delay in treatment rises to the level of deliberate indifference, in the sense that the defendant had a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted) — *i.e.*, that the defendant's actions or omissions constituted "more than gross negligence" — relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F.3d at 1327. The defendants' response to indications that a detainee may need medical attention must have been "poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice'

41

actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (alterations in original) (quoting *Estelle*, 429 U.S. at 105-06).

Therefore, "[u]ltimately, there are . . . four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Id.*

### a.    The City's liability

As discussed previously, a governmental entity may only be liable for an alleged constitutional violation under § 1983 where that violation was a result of a policy or custom of that entity.  Plaintiff contends that the City should be liable here because it "delegated the authority to make decisions about inmate medical care to shift supervisors like Captain Poague."[117]  Therefore, since he was effectively a "final policymaker," plaintiff contends that the City may be liable for Captain Poague's decision not to obtain treatment for plaintiff on the final day of his incarceration prior to his court appearance.[118]

Plaintiff is correct that, under a series of Supreme Court decisions, a municipality may be liable even for a single unconstitutional action if the actor is "an official fairly deemed to represent government policy."  *Doe v. School Board of*

---

[117] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 28.

[118] *Id.*

*Broward County, Fla.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (citation and internal quotation marks omitted).  Even so, the Eleventh Circuit has "strictly interpreted '*Monell*'s policy or custom requirement to preclude § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion.'" *Id.* at 1263 (quoting *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)).  The Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*."  *Board of County Commissioners of Bryan County, Ok. v. Brown*, 520 U.S. 397, 403 (1997).  "[W]hether a particular official has 'final policymaking authority' is a question of state law." *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989).  Crucially, the determination of who has such final, unreviewable policymaking authority and, thus, whose actions may fairly be directly attributable to the governmental entity that employs him, "is a *question of law* to be resolved by the trial court judge."  *Mandell v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989) (emphasis supplied).

It is beyond dispute that the plaintiff bears the burden to demonstrate, *as a matter of law*, that a defendant is a final policymaker.  *E.g.*, *Copper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005).  Here, plaintiff has not even ventured the argument that the decisions of shift supervisors at the jail would not be subject to any sort of

meaningful review.  Upon reviewing the record, the explanation for such a glaring, fatal omission is self-evident.  Shift supervisors, like Captain Poague, implement a clearly articulated, written policy that directs how they are to respond to inmates who are ill or injured.[119]  Their decisions are logged in the Jail Log, as Captain Poague's were here.[120]   The record is entirely devoid of even the suggestion that a shift supervisor's implementation decisions were effectively subject to no review by the shift supervisors' superiors, such as the police chief.  *See Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Local government liability can exist when someone with final policymaking authority delegates that authority to someone else.  But, the delegation must be such that the decision is not subject to review by the policymaking authority.").

Plaintiff's contention is simply a transparent attempt to impose vicarious liability upon a municipality in a context where it has roundly been rejected. Accordingly, summary judgment is due to be granted as to plaintiff's claim that the City should be liable for its deliberate indifference to his serious medical need.

### b.    Liability of Sockwell, Jones, and Brown

The court will begin its analysis of plaintiff's deliberate indifference claim

---

[119] Doc. no. 49, Ex. 8 (Muscle Shoals Police Department Jail Procedures), at 2-3, 5.

[120] Jail Log, at 42.

against the individual jailer-defendants with a discussion of whether they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 552 U.S. —, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The defense "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Until last year, district courts were required first to address whether a constitutional violation had occurred, and only then to reach the question of qualified immunity by determining whether the law governing the circumstances was sufficiently clearly established at the time of the violation. *Id.* at 201. However, in recognition of the need to conserve scarce judicial resources and the importance of avoiding decisions on constitutional questions where not strictly necessary, the Supreme Court has recently rejected this "rigid order of battle." *Pearson*, 552 U.S. —, 129 S. Ct. at 817-822. Accordingly, the court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." *Youmans v. T.A. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010).

The court holds that plaintiff has waived his argument that the remaining

individual defendants are not entitled to qualified immunity from the claims he has asserted against them.  Indeed, plaintiff's argument to the contrary, even if most charitably characterized, can only be described as perfunctory.  His argument, in its entirety, consists of a single sentence and a pair of citations.  He asserts only that, "[b]ecause plaintiff has created a fact issue regarding deliberate indifference on the part of jailers Sockwell, Jones, and Brown, these individual defendants are not entitled to qualified immunity."[121]  The basis for this extraordinary contention, as made clear from plaintiff's citation, is *Hill v. DeKalb County Regional Youth Center*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled in part by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002).  The single line of *dictum* from that case supporting his assertion, however, was *explicitly denounced* in an *en banc* decision of the Eleventh Circuit that is nearly a decade old.  *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001) (*en banc*) ("In *Hill* . . . , we see some *dicta*:  'a finding of deliberate indifference necessarily precludes a finding of qualified immunity'.  We reject that *dicta* because it incorrectly jumbles the merits of an Eighth Amendment violation with the separate concept of an immunity defense.").  Since that is the only basis for plaintiff's contention that defendants are not entitled to qualified immunity, without that piece of expressly rejected language his argument that defendants are not

---

[121] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 28.

entitled to summary judgment as to his deliberate indifference to serious medical needs claim is a nullity.

The Eleventh Circuit has very recently reiterated the long-standing principle that "once a defendant raises the defense [of qualified immunity], the plaintiff bears the burden of establishing *both* that the defendant committed a constitutional violation *and that the law governing the circumstances was already clearly established at the time of the violation*." *Youmans*, 626 F.3d at 562 (affirming summary judgment on claims of deliberate indifference to serious medical needs on the basis of individual defendants' qualified immunity) (emphasis supplied) (alteration added). Except in the most extraordinary instances, this burden *requires* the plaintiff to come forward with examples of "preexisting law [that] make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Id.* at 563 (citing *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (*en banc*)).[122]

Plaintiff's only other citation to support his argument that defendants are not entitled to qualified immunity is *Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008),

---

[122] Plaintiff does not argue — and, therefore, the court does not address — that this action presents one of those extremely rare cases "where the plaintiff establishes that the defendant's conduct so obviously violated federal law that defendant must have known the acts violated federal law even in the absence of preexisting caselaw addressing materially similar facts." *Youmans*, 525 F.3d 563 n.7 (citing *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926-27 (11th Cir. 2000)).

*overruled in part by Ashcroft v. Iqbal*, 556 U.S. —, 129 S.Ct. 1937 (2009).  That case

involved qualified immunity asserted in a motion to dismiss a detainee's claim that,

as a result of a severe pepper-spraying and inadequate decontamination, he had severe

difficulty breathing and his eyes were swollen shut for nearly thirteen hours.  *Id.* at

1304-05, 1311.  The court held the officers were not, at that stage in the litigation,

entitled to qualified immunity because the general principles outlining the boundaries

of constitutional conduct announced in other cases were sufficient to put the

defendants on notice that their conduct violated the law.  *Id.* at 1313.  This was so

because the jailers were admittedly uniquely aware of the treatment a pepper-sprayed

individual would need, did not provide it, and instead mocked the defendant.  *Id.* at

1311-13.  Critically, the court noted that Eleventh Circuit caselaw had already plainly

established that refusal to treat an inmate's obvious breathing problems would violate

his constitutional rights.  *Id.* at 1311 (citing *Adams v. Poag*, 61 F.3d 1537, 1539-40

(11th Cir. 1995)).  Most importantly for present purposes, however, *Danley* is far

from the kind of plain "legal principle announced by a decision" or "case with similar

facts that has already been decided" by the Eleventh Circuit that would satisfy the

"clearly established law" requirement of the qualified immunity analysis under the

circumstances of this action.  *Id.* at 1313 (citing *Goebert*, 510 F.3d at 1330).

Though under no obligation to do so, the court also examined the remainder

of the cases plaintiff cites throughout the portion of his brief addressing this claim. These cases only relate to plaintiff's in terms of broad generalities.  Analysis of qualified immunity "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Sacuier*, 553 U.S. at 201.  "Minor variations between cases may prove critical." *Youmans*, 626 F.3d at 563.  This is particularly so in the context of claims of deliberate indifference to a serious medical need, because such cases are unusually fact specific. *E.g.*, *id.* at 564 ("[S]pecific cases of deliberate indifference are complicated:  the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements.").

The court declines to make arguments for plaintiff as to why defendants should not be entitled to qualified immunity when defendants clearly raised the defense at multiple stages during this litigation,[123] and plaintiff has eschewed his duty to provide any cogent explanation why it should not bar his claims.  Courts cannot, and should not, assume the role of counsel for litigants, and this includes declining to shore up a "perfunctory and underdevloped argument." *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007).  This is especially true in the unique context of qualified immunity, where Supreme Court and Eleventh Circuit decisions have made plain that plaintiffs *must* present a specific kind of argument to overcome a

---

[123] *E.g.*, doc. no. 29, ¶ 62 (defendants' Answer, filed on July 31, 2009, less than a month into this action); Defendants' Brief in Support of their Motion for Summary Judgment, at 23-24, 28.

defendant's claim of immunity and the policy-based stakes are so high.  *See Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004) ("[I]mportant, even critical, public policies underlying the defense of qualified immunity . . . ."); *Lassiter v. Alabama A & M Univ*ersity, 28 F.3d 1146, 1149 (11th Cir. 1994) ("[C]ourts should think long and hard before stripping defendants of immunity."); *Youmans*, 626 F.3d 557 at 562. To reiterate, plaintiff has waived his opposition to a grant of qualified immunity to the individual defendants by failure to provide this court any reason explaining why they are not entitled to such immunity.

Even had plaintiff not waived his argument against granting the individual defendants qualified immunity, they would still be entitled to it.  In the light most favorable to plaintiff, the record shows only that defendants did not contact medical professionals at plaintiff's request for, at most, four days.  "Denial of . . . medical attention [is] not, however, [a] clearly established violation[] *per se*."  *Brown v. Thompson*, 868 F. Supp. 326, 330 (S.D. Ga. 1994) (alterations added).  Plaintiff testified that he complained to defendants that he was in pain, but by his own testimony he had at that point been without the prescription opiod pain medication to which he was addicted, Oxycodone, for at least three days.[124]  It also bears noting

---

[124] *E.g.*, Deposition of Stephen Alexander, at 7-9; *see also* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 3, ¶ 27 (plaintiff does not dispute that he was addicted to Oxycontin at the time of his arrest, and that he did not receive any Oxycontin during his incarceration, but disputes only when he last took the drug prior to his arrest).  Moreover, as this

in this context that these complaints came from a detainee who, by his own admission, had already faked a suicide attempt in order to garner the attention of the jailers, and who also had been both combative and difficult.[125]   No evidence in the record suggests that, simply from his complaints, defendants subjectively knew facts from which they could infer that "substantial risk of serious harm exist[ed], and [that they] . . . also [actually] dr[e]w the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (alterations supplied); *see also Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (same).

Defendants may have ignored plaintiff's complaints that he was having difficulty walking or standing on his right leg for, at most, two days, and could conceivably have ignored what, according to plaintiff's doctor, appeared to be a blister-like lesion on his leg.  Yet, even plaintiff has not asserted that any defendant *actually saw* that lesion.  Plaintiff's doctor, who saw him more than twelve hours after he was released, testified that the lesion could have developed in a matter of

---

court has stated on several occasions, plaintiff is deemed to have admitted this fact since he did not cite any evidentiary material to the contrary; this is especially so when defendants' statement of fact appears to be supported by plaintiff's own deposition testimony.

[125] *See, e.g.*, doc. no. 49, Ex. 11 (Deposition of Charles Sockwell), at 58 (discussing the circumstances in which paramedics are generally called regarding an inmate's requests for treatment and noting, as a general proposition, that "it's very possible he's been there before, and you know he's got mental problems[ t]hey can try to take advantage of that," and that when "you realize he's got a mental problem, you know, you consider that along with" whether immediately to contact paramedics).

hours, and plaintiff has provided no evidence as to what it looked like while he was incarcerated. Moreover, plaintiff *told* the defendants that he was having an outbreak of gout, a chronic condition from which he suffered, and that this was the cause both of the pain he was experiencing and his difficulty in putting weight on the leg. [126] At most, prior to the day of his release, a reasonable jury could only find that defendants did not contact medical professionals to examine plaintiff's gout outbreak — a condition with which plaintiff, as a chronic gout sufferer, would probably have been more familiar than the jailers. The court has scoured the federal reporters and has found not a single case in which a gout outbreak, *alone*, was held to constitute a serious medical condition requiring jailers to afford a detainee immediate medical attention. *Cf. Moore v. Bennette*, 97 Fed. Appx. 405, 407 (4th Cir. 2004), *as modified by* 517 F.3d 717 (4th Cir. 2008) (holding plaintiff had "sufficiently stated such a claim of deliberate indifference to his medical needs with regard to his Hepatitis C condition, his pancreatic condition, *and the gout in his hand*") (emphasis supplied); *Kaminsky v. Rosenblum*, 929 F.2d 922, 923 (2d Cir. 1991) (finding that denial of medical treatment for "*a variety of ailments*, *including* high blood pressure, diabetes, angina, *gout*, and an enlarged spleen" possibly gave rise to clearly established deliberate indifference claim) (emphasis supplied). For individual governmental

---

[126] Doc. no. 49, Ex. 12 (Deposition of Captain Michael Poague), at 55.

officials to have been sufficiently on notice of the unconstitutionality of their actions to strip them of qualified immunity, the law must have been settled *in this jurisdiction* — that is, there must be "controlling precedent" from which a reasonable officer would have known that his conduct would violate the plaintiff's rights. *E.g.,* *Youmans*, 626 F.3d at 565. Further, even if that condition was sufficient to give defendants subjective notice of a serious risk of harm, the jailers were not deliberately indifferent to that condition: that is, after convincing plaintiff to take the medications he initially had refused, they twice-a-day gave plaintiff his gout-management medication and, as plaintiff concedes, monitored him closely.[127]

Finally, on the day of his release, plaintiff has submitted sufficient evidence to permit the inference that defendant Sockwell acceded to the recommendation of his supervisor, Captain Poague, that they not delay plaintiff's anticipated release any further when suspicion arose that the condition was not, in fact, gout as plaintiff had told them, but was instead a staph infection. Indisputably, plaintiff was, as anticipated, released within three hours of that decision. Plaintiff has argued that a delay in the provision of medical treatment for serious medical needs "for a non-medical reason" is *per se* deliberate indifference.[128] This argument is without merit.

---

[127] *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 12, ¶ 18; *see also* doc. no. 49, Ex. 6 (Deposition of Ashley Jones), at 76; doc. no. 49, Ex. 11 (Deposition of Charles Sockwell), at 51-53.

[128] Plaintiff's Response to Defendants' Motion for Summary Judgment, at 25.

In *Hill*, a case that plaintiff cited,[129] a "delay of four hours in seeking treatment for stomach pain, vomiting blood, and blood in the plaintiff's underwear *did not constitute deliberate indifference* where the delay was due to the official's need to finish feeding the rest of the inmates." *Id.* at 565 (emphasis supplied) (describing *Hill*, 40 F.3d at 1190)*.* In *Andujar v. Rodriguez*, 486 F.3d 1199 (11th Cir. 2007), yet another case that plaintiff cites,[130] a delay of two hours in seeking treatment for heavy puncture wounds from a dog bite that severely impaired the plaintiff's ability to walk and ultimately required stitches was permissible to allow police sufficient time to book the plaintiff. *Id.* at 1201-04; *see also Youmans*, 626 F.3d. at 564-65. "[T]he reason for the delay *must* weigh in the inquiry . . . ." *Id.* at 564. With these cases in mind, a reasonable jury could not conclude that the delay between the discovery that plaintiff's condition was actually a staph infection and his release was constitutionally impermissible, much less that an "objectively reasonable officer" in Sockwell's shoes would have known that it was unconstitutional. *Id.* Indeed, this delay, and the reasons for it, is entirely *consistent* with cases in which the Eleventh Circuit has determined that a delay did not constitute deliberate indifference at all.

In short, the court is unpersuaded that a jury could reasonably infer from the

---

[129] *Id.* at 28.

[130] *Id.* at 25.

evidence on record that the individual defendants' conduct, while possibly imperfect, rose to the level of a constitutional violation.  At the very least, it is far from obvious, and plaintiff has failed to argue that it would have been "clear from the preexisting law that all objectively reasonable [jailers] would have known" that their actions were unconstitutional.  *Id.* at 566.  "Government officials are not required to err on the side of caution."  *Marsh*, 268 F.3d at 1030 n.8.  Accordingly, the individual defendants, jailers Brown, Sockwell, and Jones, are entitled to qualified immunity and, thus, summary judgment as to plaintiff's deliberate indifference claims against them is due to be granted.

### 4.    Plaintiff's state law claims

Having determined that summary judgment is due to be granted as to all of plaintiff's federal law claims, the court declines to exercise supplemental jurisdiction over the state law claims plaintiff asserts in Count IV of the original complaint. Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction."  *Id.*  Further, the Eleventh Circuit has regularly reiterated that "'if the federal claims are dismissed prior to trial, [the Supreme Court's decision in *United Mine Workers v.*] *Gibbs*[, 383 U.S. 715 (1996)], strongly encourages or *even requires dismissal* of state claims.'"  *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir.

55

1999) (emphasis supplied) (alterations added) (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (citing *Gibbs*, 383 U.S. at 726)).  The state law claims will, therefore, be dismissed without prejudice, and the court need not address the defenses to those claims asserted in defendants' motion for summary judgment.

## IV.  CONCLUSION AND ORDER

In accordance with the foregoing, plaintiff's motion for leave to file an amended complaint[131] is due to be, and the same hereby is, DENIED.  As the court has found it unnecessary to rely upon the affidavit of Leonard H. Sims in reaching a decision, plaintiff's motion to strike that affidavit[132] is hereby DENIED as moot.  Similarly, because summary judgment is due to be granted, even taking into account those portions of plaintiff's response to defendants' motion for summary judgment that defendants have moved to strike, defendants' motion to strike is likewise DENIED as moot.[133]  Finally, defendants' motion for summary judgment[134] is due to be, and the same hereby is, GRANTED with respect to each of the claims plaintiff has asserted under 42 U.S.C. § 1983, contained in Counts I through III of his original

---

[131] Doc. no. 56.

[132] Doc. no. 55.

[133] Doc. no. 62.

[134] Doc. no. 49.

complaint.  Accordingly, all of plaintiff's federal-law claims are DISMISSED with prejudice.  Further, because the court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c), contained in Count IV of the original complaint, those state-law claims are hereby DISMISSED without prejudice.  Costs incurred herein are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 26th day of January, 2011.

United States District Judge